## EISNER v. UNITED STATES.
### No. 277-52.

United States Court of Claims.
Jan. 5, 1954.

Frederick W. Eisner, New York City, for plaintiff.

Kendall M. Barnes, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant. Arthur E. Fay, Washington, D. C., was on the brief.

MADDEN, Judge.

The plaintiff sues for just compensation for what she asserts to have been the taking of her property. The property in question was a deposit of 45,263.60 German Reichmarks which she had in a bank in Berlin. The alleged taking was the conversion, by an order of the American Military Commander in Berlin, of her claim against the bank, into 2,263.20 Deutsche Marks, a new type of currency. The plaintiff says that this conversion, at the rate of 1 for 20, confiscated 95 percent of her bank account.

Upon the unconditional surrender of Germany in 1945, each of the four Allied Powers occupied a defined part or zone of the territory of Germany, but the city of Berlin, which lay inside the Russian Zone, was itself divided into four sectors, of which each of the Allied Powers occupied one. Law for the whole of Germany was made by the Allied Control Council, which consisted of the four Zone Commanders, to the extent to which they could agree upon the enactment of laws. As to matters on which the Control Council did not enact legisla-

tion, each Zone Commander was the law-making power for his Zone.

The Government of Berlin was placed, subject of course to the supervision of the Control Council, in a body called the Kommandatura, consisting of four Commandants, one for each of the four Allied Powers.

On September 20, 1945, the Control Council agreed on the following declaration:

"The Allied Representatives will exercise such control as they deem necessary over all or any part or aspect of German finance, agriculture (including forestry), production and mining, public utilities, industry, trade, distribution and economy generally, internal and external, and over all related or ancillary matters. See Department of State Bulletin, October 7, 1945, p. 516."

After the break between the Western Powers and Russia, the three western zones of Germany were combined into the Federal Republic of Germany, and an Allied High Commission was set up to exercise the authority of the three Western Allies in the Federal Republic. Whatever legislation had been enacted by the Control Council in its time remained in force unless repealed. On September 21, 1949, the occupation statute for Western Germany went into effect. The authority which had been exercised by the Zone Commanders was transferred to three High Commissioners of the three Western Allies. See Department of State Bulletin, July 11, 1949, p. 25.

In the three western zones of Germany, the banks were allowed to reopen soon after the end of hostilities in 1945. There were, of course, many regulations and restrictions imposed upon them by the Allies. Accounts of Nazis and Nazi organizations were blocked. But in Berlin, apparently because of the close relation between the banks in the Russian Sector of Berlin and those in the western Sectors, and the inability of the four Commanders in the Control Council to agree upon a course of conduct, the banks were not allowed to reopen, so far as old accounts which antedated the occupation were concerned. New accounts could be created with money acquired after the beginning of the occupation.

In 1948, in the Western Zones of Germany, a drastic reform of the currency was put into effect by the Allied Commanders. The old currency, consisting principally of Reichmarks, was called in, and persons holding it were required, within a specified time, to report and surrender their holdings, and to accept in exchange the new currency, Deutsche Marks, in general in the proportion of one Deutsche Mark for ten Reichmarks. Wages and the prices of necessities had been strictly controlled in Germany from the beginning of the occupation, and hence were not inflated to the extent that prices were in the uncontrolled market. For that reason, presumably, payments of wages owing at the date of the currency reform were not subjected to the drastic 1 for 10 reduction that was applied to most other obligations.

In Berlin, on June 24, 1948, the Commandants of the three Western Powers issued an Ordinance for Monetary Reform, and on July 4, 1948, a second such Ordinance. These decrees were, in general, to the same effect as those which were issued for the Western Zones of Germany. But they made no direct provision for the conversion of the old preoccupation bank accounts, which were still blocked and unavailable. On December 23, 1949, by which time the Zone Commanders had been replaced by High Commissioners and the American authority in Berlin had become known as the Berlin Element of the Office of the United States High Commissioner for Germany, the Chief of that Element, who was the United States Commandant of the United States Sector of Berlin, issued Regulation No. 19. He recited that the Second Ordinance of Monetary Reform, dated July 4, 1948, and referred to above, had reserved the question of what should be done about credit balances resulting from deposits made before May

9, 1945, the date of unconditional surrender. He then decreed that such Reichmark balances might be converted at the rate of 20 to 1 if the owner of the deposit was, on October 1, 1949, a national of one of the United Nations. The plaintiff was, and is, a citizen and resident of the United States. She accepted the payment of the 2,263.20 Deutsche Marks, but reserved her right to make a further claim for her alleged loss.

■ The plaintiff is not entitled to recover. The task of occupying powers in a great and complex country such as Germany, whose own Government had completely collapsed, was an almost insuperable one. Certainly it included the power to establish a rational monetary system. The difficulties of such a reform were so great that it was long, perhaps too long, delayed. But until a stable currency was established, economic recovery lagged, the population suffered, and the financial burden upon the occupying powers continued. The hoped-for benefits of the currency reform were realized almost at once. Like any other fundamental change of law or Government policy, it brought hardships to some people. Such hardships cannot, of course, be regarded as creating claims against the Government, else all legal change would become fiscally impossible.

Our officials in Germany, in consultation with our Allies and with the Germans, worked out the difficult problem of currency reform as best they could. It seems to us that they might have treated the pre-occupation claims against Berlin banks as worthless, and given them no conversion value in the new, sound currency. The banks were no doubt full of bonds of the Hitler Government which were worthless; such other securities as still had a nominal value may well have been on deposit in a branch in the Russian Sector of Berlin completely beyond hope of recovery and realization, or may have been the obligations of enterprises in the Russian Zone of Germany, entirely uncollectible. The plaintiff's assumption that one piece of sound money is worth to her only one-twentieth of the worth of the claim which she surrendered in return for that piece of sound money is unwarranted. For aught we know, the discrepancy might be in the opposite direction.

■ The currency reform here in question was a sovereign act, reasonably calculated to accomplish a beneficial purpose, and if it did have any adverse effect upon the plaintiff, she cannot, under well-settled principles, shift that effect to the public treasury.

The plaintiff urges that the fact that some claims, such as current labor claims, were collectible one for one, and most postoccupation claims were collectible one for ten, shows that her Reichmark claims were worth more than one for twenty. We think it would have been unreasonable to regard old claims against banks which must have been made hopelessly insolvent by the collapse of the Government and the invalidation of its bonds as equal in value to accounts which had been built up after the beginning of the occupation. Our bankruptcy and reorganization laws grade claims according to their worth and their social importance. They are not regarded as Governmental confiscation of the property of those who receive little or nothing because other claims have priority over them.

It is not necessary for us to decide whether the fact that the property here in question was outside the United States would be a bar to the plaintiff's claim.

The Government's motion for a summary judgment is granted, and the plaintiff's petition is dismissed.

It is so ordered.

JONES, C. J., and WHITAKER, LITTLETON, JJ., concur.